UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | | |
|---|---|---|
| ZW GLOBAL, INC. et al., | ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | 3:11-cv-00254-RCJ-RAM |
| KAREN SNOW, | ) ) | **ORDER** |
| Defendant. | ) ) | |

This case arises out of the departure of Plaintiffs' employee and that employee's alleged subsequent defamation of Plaintiffs and interference with Plaintiffs' business relations. The state court issued a temporary restraining order ("TRO") against Defendant, which this Court refused to extend. Plaintiffs moved orally for a preliminary injunction, and Defendant moved to dismiss for lack of personal jurisdiction. Plaintiff has since withdrawn the motion for preliminary injunction. For the reasons given herein, the Court grants the motion to dismiss for lack of personal jurisdiction in part, transferring the case to the Eastern District of Virginia where there is general jurisdiction over Defendant.

**I.  FACTS AND PROCEDURAL HISTORY**

Plaintiff William R. Lenhard, II founded the ZephyrWest business to carry out his proprietary business model. (Compl. ¶ 8, Mar. 30, 2011, ECF No. 1-1, at 2). ZephyrWest consists of three companies: (1) ZW Global, Inc., a for-profit corporation to conduct operations;

(2) BlueZephyr, Inc., a close corporation held by Lenhard and his family to manage intellectual property, licensing, and research and development; and (3) ZWG Trust, LLC, a limited liability company designed to hold the assets of ZephyrWest's elderly customers. (*Id.* ¶¶ 11-14). It became clear at the TRO hearing that ZephyrWest's business model consists of purchasing life insurance policies against elderly customers (or perhaps being named as the beneficiary on policies the customers themselves purchase while ZephyrWest pays the premiums) in exchange for constructing homes for those customers to reside in until they die. Because the insurance proceeds will not be realized until death, and the customers require housing immediately under such an agreement, ZephyrWest solicits investors to finance the construction of the homes, and the investors expect to realize a profit along with ZephyrWest when the customers die.

"In or around May 2010, [Defendant Karen] Snow became an active employee of ZW Global." (*Id.* ¶ 16). She became a director of ZW Global on or about September 4, 2010. (*Id.* ¶ 18). On or about March 3, 2011, Snow "demanded perpetual employment and a perpetual position on ZW Global's Board of Directors." (*Id.* ¶ 20). Lenhard agreed to require that Snow could only be removed for cause or incapacity. (*Id.* ¶ 21). On or about March 18, 2011, Snow demanded a 55% ownership interest in ZephyrWest and 5% of all its income for the remainder of her life, including funds held in trust for the elderly customers. (*Id.* ¶ 23). Lenhard opposed Snow's demand but drafted a meeting agenda for a proposed meeting between him, Snow, ZephyrWest's attorney, and ZephyrWest's insurance agent Kerry Day to discuss the demand. (*Id.* ¶¶ 23–24). After she received the agenda, but before Lenhard scheduled any meeting, Snow committed the acts of which Plaintiffs now complain. (*Id.* ¶ 25).

On or about March 21, 2011, Snow contacted Day and Day's company, American Insurance Marketing Corp., LLC ("AIMC") and attempted to terminate ZephyrWests's

relationship with AIMC.[1] (*Id.* ¶ 26). She also contacted Jim Ostrander, one of ZephyrWest's fundraisers, who then accused Lenhard of developing a Ponzi scheme. (*Id.* ¶ 27). On or about March 22, 2011, she told an unidentified person that she intended to persuade Day to "exclude Lenhard from their business plan" and to persuade ZephyrWest's housing architect Douglas Cardinal to terminate his work with ZephyrWest in Canada. (*Id.* ¶¶ 28–29). She also contacted Day directly and accused Lenhard and Day of insurance fraud and Lenhard of hacking into Ostrander's email account to tamper with his emails. (*Id.* ¶ 30). She told ZephyrWest's attorney Tom Brooksbank, "If I don't get my 5%, nobody else will get anything, and there will be no project." (*Id.* ¶ 31). ZW Global suspended her without pay and told her to cease and desist. (*Id.* ¶ 32). On or about March 23, 2011, Ostrander resigned because he believed ZephyrWest would give its Canadian customers at the First Nation project "a pittance for their lives" while making "others rich beyond belief." (*Id.* ¶ 33). ZephyrWest fears it may have lost $5,000,000 in prospective investments due to Ostrander's resignation. (*Id.* ¶ 34). Snow sent Day another email in an attempt to get him to dissociate himself from Lenhard and ZephyrWest, implying that Lenhard had manipulated him or that his "head is in the sand." (*Id.* ¶ 36). On or about March 24, 2011, Snow contacted Chris Shade from the Blood Tribe Department of Health in Canada to persuade him to terminate relations with ZephyrWest. (*Id.* ¶ 37). ZW Global terminated Snow's employment and removed her as a director on March 24, 2011. (*Id.* ¶ 38). Plaintiffs believe Snow has continued and will continue to contact their clients, affiliates, customers, and employees to damage the business. (*Id.* ¶ 39).

Lenhard, ZW Global, and BlueZephyr sued Snow in state court in Reno, Nevada on eight claims: (1) Injunctive Relief; (2) Intentional Interference with Prospective Economic Advantage; (3)–(4) Breach of Fiduciary Duty; (5) Negligence; (6) Business Disparagement; and (7)–(8)

---

[1] A company calling itself American Insurance Marketing Corporation, LLC has its main offices in Georgia and is listed by the Georgia Secretary of State as an Indiana Corporation. The Indiana Secretary of State lists AIMC as an active, domestic, for-profit corporation.

Defamation. The state court issued a TRO against Defendant, which expired on April 16, 2011 after the Court refused to extend it. (TRO, Apr. 1, 2011, ECF No. 3-2). Plaintiffs moved orally for a preliminary injunction at the TRO hearing but have since withdrawn the motion. Defendant has moved to dismiss for lack of personal jurisdiction.

## II. LEGAL STANDARDS

A defendant may move to dismiss for lack of personal jurisdiction. *See* Fed. R. Civ. P. 12(b)(2). Jurisdiction exists if: (1) provided for by law; and (2) the exercise of jurisdiction comports with due process. *See Greenspun v. Del E. Webb Corp.*, 634 F.2d 1204, 1207 (9th Cir. 1980). When no federal statute governs personal jurisdiction, a federal court applies the law of the forum state. *See Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008). Where a forum state's long-arm statute provides its courts jurisdiction to the fullest extent of the Due Process Clause of the Fourteenth Amendment, such as Nevada's does, *see Arbella Mut. Ins. Co. v. Eighth Judicial Dist. Court*, 134 P.3d 710, 712 (Nev. 2006) (citing Nev. Rev. Stat. § 14.065), a court need only apply federal due process standards, *see Boschetto*, 539 F.3d at 1015.[2]

There are two categories of personal jurisdiction: general jurisdiction and specific

---

[2] Nevada's long-arm rule restricts extra-territorial jurisdiction to the limits of both the U.S. and Nevada Constitutions. *See* Nev. Rev. Stat. § 14.065(1). However, Nevada's due process clause is textually identical to the federal clause in relevant respects, *see* Nev. Const. art. 1, § 8(5), and the Nevada Supreme Court reads the state clause as coextensive with the federal clause, *see, e.g.*, *Wyman v. State*, 217 P.3d 572, 578 (Nev. 2009). Until 1868, when the Fourteenth Amendment was adopted, the Due Process Clause of the Fifth Amendment did not apply to the states. *See Barron v. City of Baltimore*, 32 U.S. 243, 250–51 (1833) (Marshall, C.J.). The Declaration of Rights that comprises Article I of the Nevada Constitution, which was adopted in 1864, was included in order to impose certain restrictions on the State of Nevada that were already imposed against the federal government under the Bill of Rights, and the Nevada Supreme Court has not interpreted the protections of the Declaration of Rights to exceed the scope of their federal counterparts. Michael W. Bowers, *The Sagebrush State* 43–44 (3rd ed., Univ. Nev. Press 2006); Michael W. Bowers, *The Nevada State Constitution* 24 (1993). During the Nevada Constitutional Convention in 1864, the Due Process Clause of Article I was not debated, although several other provisions of Article I, and even Section 8, were heavily debated. *See generally* Andrew J. Marsh, Official Report of the Debates and Proceedings of the Constitutional Convention of the State of Nevada (Frank Eastman pr., 1866), *available at* http://books.google.com.

jurisdiction. General jurisdiction exists over a defendant who has "substantial" or "continuous and systematic" contacts with the forum state such that the assertion of personal jurisdiction over her is constitutionally fair even where the claims are unrelated to those contacts. *See Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1171 (9th Cir. 2006) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415 (1984)). A state court has general jurisdiction over the state's own residents, for example.

Even where there is no general jurisdiction over a defendant, specific jurisdiction exists when there are sufficient minimal contacts with the forum state such that the assertion of personal jurisdiction "does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945) (quoting *Milliken*, 311 U.S. at 463). The standard has been restated using different verbiage. *See Hanson v. Denckla*, 357 U.S. 235, 253 (1958) ("[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." (citing *Int'l Shoe Co.*, 326 U.S. at 319)); *World-wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) ("[T]he foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." (citing *Kulko v. Superior Court of Cal.*, 436 U.S. 84, 97–98 (1978))). From these cases and others, the Ninth Circuit has developed a three-part test for specific jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Boschetto*, 539 F.3d at 1016 (quoting *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004)).

> The plaintiff bears the burden on the first two prongs. If the plaintiff establishes both prongs one and two, the defendant must come forward with a "compelling case" that the exercise of jurisdiction would not be reasonable. But if the plaintiff fails at the first step, the jurisdictional inquiry ends and the case must be dismissed.

*Id.* (citations omitted). The "purposeful direction" option of the first prong uses the "*Calder*-effects" test, under which "the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1128 (9th Cir. 2010) (quoting *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir.2006) (en banc)). The third prong is a seven-factor balancing test, under which a court considers:

> (1) the extent of the defendant's purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendants' state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Menken v. Emm*, 503 F.3d 1050, 1060 (9th Cir. 2007) (quoting *CE Distrib., LLC v. New Sensor Corp.*, 380 F.3d 107, 1112 (9th Cir. 2004)).

### III.  ANALYSIS

Plaintiffs allege, and Defendant herself attests, that Defendant is a Virginia resident, which is critical to subject matter jurisdiction in this case because all Plaintiffs are Nevada residents. (*See* Compl. ¶¶ 1–4; Snow Decl. ¶ 2, Apr. 18, 2011, ECF No. 7). Plaintiffs do not otherwise allege that Snow has substantial or systematic contacts with Nevada. There is therefore no general jurisdiction over Defendant in Nevada, and Plaintiffs must rely on specific jurisdiction.

Plaintiffs initially bear the burden of showing Defendant's purposeful direction of her

Page 6 of 11

activities towards Nevada or her purposeful availment of the privilege of conducting activities in Nevada. Snow attests that she has never lived or worked in Nevada, has no property or bank accounts in Nevada, has no licenses issued by Nevada, has never signed any contract in Nevada, has never hired or solicited anyone from Nevada, and has never conducted any business in Nevada. (Snow Decl. ¶¶ 3–4). At oral argument, Snow's counsel indicated that Snow had visited Las Vegas, Nevada approximately fifteen years ago for a vacation. She attests that an unidentified "acquaintance" introduced her to Lenhard over the telephone in 2009 while she was in Virginia. (*Id.* ¶ 5). Lenhard visited Snow in Virginia to discuss the ZephyrWest business. (*Id.* ¶ 6). Snow and Lenhard spoke several times by telephone thereafter and she eventually agreed to help him raise money for the ZephyrWest business, which Lenhard had explained to Snow was designed to fund elder care for Native Americans in Canada through life insurance policies. (*Id.* ¶¶ 6–7). Lenhard agreed to pay Snow $2500 per week, which he characterized as a loan that she could repay with the $250,000 salary she would earn if she raised enough capital to make ZW Global profitable and were named as a director. (*Id.* ¶ 8). Lenhard also offered to purchase her a home for $1.5 million. (*Id.*). Lenhard made it clear Snow would not be an employee during the fundraising stage. (*Id.*). As evidence of the parties' intent that the $2500 was a loan and not a wage or salary, Lenhard withheld no taxes or insurance from the payments and issued no IRS Form W-2. (*Id.*). Snow and John Kleski raised a total of $582,000 from eleven investors in Virginia. (*Id.* ¶ 9). Eventually, Lenhard presented Snow with a board resolution to appoint Snow as a director, but after consulting with her attorney, she declined to sign it. (*Id.* ¶ 10). When Snow learned that an entity solely owned by Lenhard, not ZW Global, would hold the insurance policies, she became concerned that ZW Global was undercapitalized because it was to bear all the risk but was to have no assets. (*Id.*). She dissociated herself from Lenhard because of her fear of the risk of being associated with him. (*Id.*).

Plaintiffs have adduced no evidence indicating that Snow ever entered Nevada in

connection with her present activities. But they do adduce evidence that Snow was a director and/or officer of ZW Global. Lenhard attests that "on or about September 4, 2010, Snow was appointed as a director," that ZW Global's Bylaws listed her as a director, that she obtained an Employer Identification Number from the IRS for ZW Global, that ZW Global's initial list of officers, directors, and registered agent showed Snow as the President and Secretary, and that Snow executed an assignment of a life insurance policy on behalf of ZW Global on which she identified herself as President of ZW Global, just as she did on hundreds of similar documents. (Lenhard Decl. ¶¶ 12–15, Apr. 25, 2011, ECF No. 13). Lenhard attaches Exhibits 2–7 to prove these claims.

Exhibit 2 is a resolution of the board of directors indicating the appointment of Karen Snow as a director by "William Lenhard, II, startup acting director and secretary." (Resolution, Sept. 4, 2010, ECF No. 13-2). This attempted appointment was likely ineffective, even assuming Snow had agreed to it (her signature block is blank). It is a fundamental principal of corporation law that neither directors nor officers appoint directors. Rather, shareholders elect directors, who in turn appoint officers. In Nevada, aside from a few exceptions concerning stock, a close corporation must be formed in the same way as a normal corporation under sections 78.030 to 78.055. Nev. Rev. Stat. § 78A.020. Lenhard filed the Articles of Incorporation ("Articles") of the close corporation as "subscriber." (Articles 1, Aug. 30, 2010, ECF No. 13-1). Traditionally, a "subscriber" is a person who has promised to purchase stock upon incorporation. An "incorporator" or "promoter" is a person who forms a corporation. Nevada, however, permits "[o]ne or more persons" to form a corporation by simply signing and filing the articles of incorporation. Nev. Rev. Stat. § 78.030(1). William Lenhard, II and William Lenhard, III are listed as the initial directors in the Articles. (*Id.* 4). The Articles indicate that the number of directors is two, but that it could be increased by the Bylaws. (*Id.*). Nevada law permits the number of directors to be changed by provisions in articles or bylaws.

Nev. Rev. Stat. § 78.115.  William Lenhard, II was the only director present at the board meeting that purportedly appointed Snow as director, (*see* Resolution 1), but unless all directors give written consent, a majority of directors is required for a quorum unless the articles or bylaws provide otherwise, and one of two directors is not a majority, *see* Nev. Rev. Stat. § 78.315(1). The Bylaws (Exhibit 3) also purport to name Snow as a director, (Bylaws 1, Sept. 15, 2010, ECF No. 13-3), but again, the Bylaws are only signed by William Lenhard, II, who cannot transact business on his own as one of two directors.  Moreover, after incorporation directors must be elected by shareholders, not simply appointed by the existing board of directors, whether via bylaws or otherwise. Nev. Rev. Stat. § 78.330(1) ("Unless elected pursuant to NRS 78.320, or unless the articles of incorporation or the bylaws require more than a plurality of the votes cast, directors of every corporation must be elected at the annual meeting of the stockholders by a plurality of the votes cast at the election.").  A close corporation in Nevada may chose to operate without a board of directors, but if it has directors the general rules apply.  In summary, there is no evidence at all in the record apart from Lenhard's own conclusory attestation that Snow was ever a director of ZW Global.

Exhibit 4 is the purported evidence that Snow obtained an Employer Identification Number from the IRS for ZW Global.  But it does not in fact tend to prove what Lenhard supposes it does.  The first page of the exhibit is the heading of an email from Snow to Day, Chuck Snow, and Lenhard.  The second page of the exhibit is a print-off from irs.gov indicating the successful assignment of an EIN endnig in "0633" to "ZWGLOBAL INC."  Nothing connecting the two pages indicates that Snow entered the application or even that the print-off was part of the email.

Exhibit 5 is page one of a Nevada Secretary of State form listing the initial officers and directors of ZW Global, Inc. (Initial List, Jan. 27, 2011, ECF No. 13-5).  It lists Snow as President and Secretary, and it includes her name in the signature block, but it is not her

1 handwritten signature, only her name in typed letters without any indication of electronic
2 signature such as "/s/." (*Id.*).

3 Exhibit 6 is a print-off, likely from the Nevada Secretary of State website, listing Snow
4 as President and Secretary.

5 Exhibit 7 is an assignment of a life insurance policy to John R. Prickett. (Assignment,
6 Feb. 7, 2011, ECF No. 13-7). Snow signed this document as "President ZW Global" and
7 "Owner with Title." (*Id.* 2). Although it tends to show Snow was President of ZW Global for the
8 purposes of the present motion, the transaction itself is a bit confusing. Lenhard himself is listed
9 as "Insured (life insurance)" and/or "Owner (annuity)." (*Id.* 1). It is not clear if this is Lenhard's
10 personal life insurance policy or a policy he has taken out against another person. The insured, if
11 not Lenhard, is not identified. Prickett, whose address is listed as being in Fredericksburg,
12 Virginia, is listed as "assignee," and he is likely one of the investors. (*Id.*).

13 "[O]rdinarily[,] 'use of the mails, telephone, or other international communications
14 simply do not qualify as purposeful activity invoking the benefits and protection of the [forum]
15 state.'" *Peterson v. Kennedy*, 771 F.2d 1244, 1262 (9th Cir. 1985) (quoting *Thos. P. Gonzalez
16 Corp. v. Consejo Nacional de Produccion de Costa Rica*, 614 F.2d 1247, 1254 (9th Cir. 1980))
17 (third alteration in *Peterson*). Snow did not solicit Lenhard in Nevada. Lenhard solicited Snow
18 in Virginia. None of the investors she contacted are alleged to live in Nevada. As far as Snow's
19 alleged communications to Day, Ostrander, and Shade, Plaintiffs do not indicate where these
20 persons were located, except that Shade was located in Canada.

21 Snow's contacts with Nevada are few and weak. The first prong of the test may be
22 satisfied, because although most of the evidence does not tend to show any purposeful acts by
23 Snow, and it appears she was never properly elected as a director, the assignment of the life
24 insurance policy indicates that Snow confirmed her role as President of ZW Global, a Nevada
25 corporation. However, Plaintiffs fail to satisfy the second prong of the specific jurisdiction test.

The claims in this case simply do not arise out of forum-related activity. Actions of a director or officer of a corporation do not automatically subject the director or officer to specific jurisdiction in the corporation's state of incorporation without more. *See Davis v. Metro Prods., Inc.*, 885 F.2d 515, 522 (9th Cir. 1989) ("[A] long-arm statute may, consistent with constitutional due process, allow assertion of personal jurisdiction over officers of a corporation as long as the court finds *those officers* to have sufficient minimum contacts with [the forum state]." (emphasis added)). Snow is alleged to have conducted all of her acts on behalf of ZW Global in Virginia, with Virginia investors. There is no personal jurisdiction over her in Nevada in this case. The Court therefore need not address the reasonableness prong.

**CONCLUSION**

IT IS HEREBY ORDERED that the Motion to Dismiss (ECF No. 6) is GRANTED in part, and the case is TRANSFERRED to the Eastern District of Virginia pursuant to 28 U.S.C. § 1406(a) for lack of personal jurisdiction over Defendant in the District of Nevada.

IT IS SO ORDERED.

Dated this 27th day of April, 2011.

_____
ROBERT C. JONES
United States District Judge